# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BRADLEY E. JULIUS, in his capacity as Seller Representative,

Plaintiff,

v.

ACCURUS AEROSPACE CORPORATION and ACCURUS AEROSPACE WICHITA LLC (f/k/a ZTM Acquisitions, LLC, f/k/a ZTM Aerospace, LLC),

Defendants.
_____

ACCURUS AEROSPACE CORPORATION and ACCURUS AEROSPACE WICHITA LLC (f/k/a ZTM Acquisitions, LLC, f/k/a ZTM Aerospace, LLC),

Counterclaim-Plaintiffs,

v.

ZTM, INC. (n/k/a BKJ Holdings, Inc.), THE KELLEY JULIUS REVOCABLE TRUST, THE BRADLEY JULIUS REVOCABLE TRUST, and BRADLEY E. JULIUS, in his capacity as Seller Representative,

Counterclaim-Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2017-0632-MTZ

## MEMORANDUM OPINION
Date Submitted: July 11, 2019
Date Decided: October 31, 2019

Lisa Zwally Brown, GREENBERG TRAURIG, LLP, Wilmington, Delaware; Paul D. Brown and Stephanie S. Habelow, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Lynn D. Preheim and Christina J. Hansen, STINSON LEONARD STREET LLP, Wichita, Kansas, *Attorneys for Plaintiff Bradley E. Julius and Counterclaim-Defendants, ZTM, Inc., The Kelly Julius Revocable Trust, The Bradley Julius Revocable Trust, and Bradley E. Julius.*

Raymond J. DiCamillo, Kevin M. Gallagher, Sara C. Hunter, and Ryan D. Konstanzer, RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; Thad J. Bracegirdle and Andrea Schoch Brooks, WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; Adam H. Offenhartz, Peter M. Wade, David F. Crowley-Buck, and Lauren M. Kobrick, GIBSON, DUNN & CRUTCHER LLP, New York, New York, *Attorneys for Defendants and Counterclaim-Plaintiffs Accurus Aerospace Corporation and Accurus Aerospace Wichita LLC.*


**ZURN, Vice Chancellor.**

This case, concerning an acquisition in the aviation parts industry, teaches an important lesson about the benefits of allocating risk among contracting parties and detriments of imprecise drafting. The buyers considered this acquisition in a niche industry to be very lucrative. The sellers produced parts for a particularly important customer: the world's largest aerospace company, The Boeing Company.

Boeing parts generated significant revenue for the company. At the time of contracting, all parties knew the sellers' contracts for dozens of high-revenue Boeing parts expired at the end of 2016. This was a common occurrence in the industry, and it was typical for parts to be added to and removed from the sellers' master contract with Boeing. On most occasions, Boeing would request a quote for expiring parts and afford the sellers the opportunity to re-bid on those parts.

Throughout the due diligence process and at the time of closing, both the buyers and sellers believed in good faith that Boeing would give the company the opportunity to re-bid on all parts expiring at the end of 2016, as Boeing had done for other expiring parts in the past. Aware of the value derived from producing these parts, the buyers elected to pursue the acquisition. The deal closed, and the parties placed a portion of the purchase price in an escrow fund, anticipating the possibility of litigation.

Though there was no guarantee the company would win the Boeing contracts, the buyers walked into a situation that was worse than they expected. Months after

the acquisition, the buyers learned Boeing never requested quotes for dozens of parts under the expiring contracts. Much to the buyers' dismay, Boeing awarded those contracts to other suppliers in 2013 and 2014 and, therefore, the company had "lost" the opportunity to bid on those parts at that time. The buyers do not allege that, at the time of contracting, the sellers knew these parts would be unavailable for re-bid.

Seeking redress for the lost bid opportunity, the buyer refused to consent to release the escrow funds. The sellers filed suit to obtain those funds. The buyers counterclaimed, alleging breaches of representations and warranties in the governing asset purchase agreement. The parties filed cross-motions for partial summary judgment on the issue of liability on all counts brought by all parties. For the reasons explained below, I find that the sellers are entitled to summary judgment on the buyers' counterclaim and that the buyers are entitled to summary judgment on the sellers' affirmative claims.

## I. BACKGROUND

Plaintiff Bradley E. Julius brings five affirmative claims for relief, in his capacity as Seller Representative, on behalf of BKJ Holdings, Inc. (f/k/a ZTM, Inc.) ("ZTM" or the "Company"), the Bradley E. Julius Revocable Trust, the Kelly Julius Revocable Trust, Kelly E. Julius, and himself (collectively, "Sellers"). In response, Defendants Accurus Aerospace Corporation and Accurus Aerospace Wichita LLC (f/k/a ZTM Acquisitions, LLC, f/k/a ZTM Aerospace, LLC) (collectively,

4

"Accurus" or "Buyers") assert a counterclaim against Sellers. The parties have filed cross-motions for summary judgment on all claims, so I draw the facts from the evidentiary record developed by the parties.[1]

A. **ZTM Succeeds In The Aviation Parts Industry, And Boeing Becomes ZTM's Most Valuable Customer.**

Julius founded ZTM, which he owned and controlled as Trustee of the Bradley E. Julius Revocable Trust, together with Kelly Julius as Trustee of the Kelly Julius Revocable Trust.[2] ZTM operated out of Wichita, Kansas, one of the key aerospace supply regions in the United States.[3] ZTM manufactured large, complex precision aerospace parts and assemblies for major commercial aviation and military customers.[4] By 2015, ZTM had grown to a business of 126 employees with over $35 million in anticipated revenue.[5] ZTM's primary customer was The Boeing Company ("Boeing"), which accounted for more than half of its sales.[6] In 2014, revenue from Boeing-related entities comprised 66.3% of ZTM's sales.[7] ZTM

---

[1] *See* Ct. Ch. R. 56(c).

[2] *See* Docket Item ("D.I.") 14 ¶¶ 2, 23.

[3] *Id.* ¶ 2. Since the acquisition at issue, the Company no longer operates as ZTM. *Id.*

[4] D.I. 12, Defs.' Answer ¶ 3; D.I. 14 ¶¶ 2, 23.

[5] D.I. 14 ¶ 23.

[6] D.I. 67, Ex. B at KSHD_0003821; D.I. 67, Ex. E (Hoopes Dep.) 39:15–17. The parties attached deposition excerpts as exhibits to various briefs. For clarity, I identify the deposition using the docket item, exhibit reference, and deposition name.

[7] D.I. 67, Ex. B at KSHD_0003820.

5

projected that by 2016, Boeing-related entities would account for 70.3% of ZTM's sales.[8]

The relationship between ZTM and its customers, such as Boeing, followed an industry-standard pattern. Airplane parts manufacturers typically enter into a Long Term Agreement ("LTA"), or "master contract," with customers like Boeing.[9] That LTA establishes the terms on which the supplier will manufacture parts for the customer.[10] The LTA often contains separate sub-contracts for specifically identified parts, which may expire before the LTA does.[11] ZTM and Boeing entered into a master contract that included sub-contracts for certain Boeing parts.[12] Some of those contracts were set to expire at the end of 2016, before the master contract's expiration date.[13]

Suppliers can bid on sub-contracts to manufacture parts.[14] When Boeing bids out parts, it typically sends a Request for Proposal ("RFP") or Request for Quotation ("RFQ") to the supplier.[15] After receiving the RFQ or RFP from manufacturers like

---

[8] *Id.* at KSHD_0003821.

[9] *See* D.I. 67, Ex. D (Gibson Dep.) 39:11–16; D.I. 14 ¶ 5.

[10] *See* D.I. 67, Ex. E (Hoopes Dep.) 39:18–40:25.

[11] *See id.*

[12] D.I. 67, Ex. E (Hoopes Dep.) 39:18–40:25; D.I. 14 ¶ 5.

[13] *See* D.I. 14 ¶ 36; *see also* D.I. 67, Ex. F (Capperauld Dep.) 18:17–19:6.

[14] *See, e.g.*, D.I. 79, Ex. D-1 (Gibson Dep.) 210:14–211:17.

[15] *See* D.I. 67, Ex. F (Capperauld Dep.) 51:8–18; D.I. 66 at 8.

ZTM, Boeing determines which manufacturer wins the contract, and sends that manufacturer an award letter.[16]

The award letter identifies the specific parts Boeing has awarded to the manufacturer.[17] Via amendment, those parts "roll on" or are added to the master contract.[18] But if the manufacturer bid for parts under an expiring contract and Boeing decided to award those expiring parts to another company, then the expiring parts would "roll off" of the master contract at their expiration date.[19] ZTM maintained master electronic files on its internal system that contained all RFQs, RFPs, award letters, and related documents.[20]

Manufacturing parts for Boeing through this process was the "bread and butter" of ZTM's business.[21] Although winning a contract renewal bid with Boeing was not guaranteed, the opportunity to re-bid on existing contracts was "critical to

---

[16] *See, e.g.*, D.I. 67, Ex. F (Capperauld Dep.) 54:13–21.

[17] *See id.* 52:13–53:2, 54:13–21.

[18] *See id.* 52:13–53:7; D.I. 77, Ex. 3 (Capperauld Dep.) 94:5–18, 243:15–24.

[19] *See, e.g.*, D.I. 96 at 8, 20, 50 [hereinafter "Hearing Tr."].

[20] *See* D.I. 67, Ex. G (Woodson Dep.) 38:6–24.

[21] D.I. 67, Ex. C (Julius Dep.) 128:4–12; *see also id.* 69:14–70:14, 102:5–18.

the success of [ZTM]"[22] and was the "lifeblood" of the Company.[23] ZTM vigorously pursued the opportunity to re-bid on expiring contracts.[24]

For example, the Company proactively reached out to Boeing to secure such opportunities in 2015.[25] In the summer and fall of 2015, ZTM received four RFQs offering the opportunity to bid to renew parts that were expiring at the end of 2015.[26] ZTM received an award letter in December 2015 for those RFQs.[27] Upon receiving that award letter, Jamie Woodson, ZTM's business manager, identified parts for which ZTM was not provided the opportunity to re-bid, and contacted Boeing for an explanation.[28] The value of those parts was approximately $2 million in sales in 2015.[29] Similarly, upon learning in 2015 that Boeing was offering the opportunity to re-bid on certain parts expiring in 2016 and 2017, Julius and Woodson contacted Boeing and took immediate steps to secure ZTM's ability to re-bid on those parts.[30]

---

[22] *Id.* 104:1–3.

[23] *Id.* 102:5–18.

[24] *See, e.g., id.* 69:20–70:23, 104:1–14.

[25] *See* D.I. 87 at 4–5.

[26] D.I. 88, Exs. II (RFQ-46985-101), JJ (RFQ-46985-201), KK (RFQ-46985-301), LL (RFQ-46985-401), MM.

[27] D.I. 88, Ex. PP (Award Letter dated December 17, 2015 referencing RFQ-46985-101, -201, -301, and -401).

[28] D.I. 88, Ex. OO; D.I. 88, Ex. G-1 (Woodson Dep.) 341:2–13.

[29] D.I. 88, Ex. MM at ACC_000058015.

[30] *Id.*; D.I. 88, Ex. C-1 (Julius Dep.) 106:7–16.

## B. Julius Decides To Sell ZTM.

Rowan Taylor founded Liberty Hall Capital Partners, L.P ("Liberty") in 2011. Liberty is a private equity firm focused exclusively on investments in the aerospace industry.[31] Liberty formed Accurus in November 2013,[32] and continues to control Accurus through an affiliate.[33] Accurus is a buyer of aerospace manufacturing companies. Liberty, either independently or through Accurus, acquired six aerospace companies prior to acquiring ZTM.[34]

In 2015, Julius decided to sell ZTM. He hired Koch Siedhoff Hand & Dunn, LLP ("Koch") to assist with the sale.[35] During the sale process, ZTM marketed itself as the "second largest interior shop for Boeing Commercial."[36] In August 2015, ZTM's broker, Ed Dunn, approached Accurus about a potential sale of ZTM's assets, property, and rights.[37] Dunn sent an executive summary of the opportunity to Liberty.[38]

---

[31] D.I. 67, Ex. H (Taylor Dep.) 73:23–74:14.

[32] *Id.* 111:1–7.

[33] D.I. 64, Ex. 5 at 9.

[34] D.I. 67, Ex. H (Taylor Dep.) 110:2–111:23.

[35] D.I. 67, Ex. C (Julius Dep.) 42:2–4.

[36] D.I. 67, Ex. B at KSHD_0003823.

[37] *See* D.I. 67, Ex. I; D.I. 67, Ex. H (Taylor Dep.) 190:21–191:2.

[38] D.I. 14 ¶ 33.

On behalf of Liberty, Taylor signed a confidentiality agreement with ZTM dated August 13, 2015 (the "Confidentiality Agreement").[39] Under the Confidentiality Agreement, Liberty received "Evaluation Materials" in order to evaluate a possible transaction with ZTM.[40] The Confidentiality Agreement defines "Evaluation Materials," in part, as

> all information, in whatever form or format and however it may be embodied, concerning the Disclosing Party that are furnished, made available, or otherwise disclosed to a Receiving Party by or on behalf of the Disclosing Party, orally or in writing, and whether or not such Evaluation Materials in whole or in part are protectable trade secrets independent from this Agreement; and includes the business plans, historic financials, projected financials, PowerPoint presentations, software, contracts, agreements, understandings, notes, analyses, compilations, studies or other documents or materials whether prepared by any Party or others, which contain or reflect all or any portion of such materials.[41]

In the Confidentiality Agreement, Liberty and ZTM agreed, "[T]he other Party does not make any representation or warranty as to the accuracy or completeness of such other Party's Evaluation Materials."[42]

After signing the Confidentiality Agreement, Accurus determined that the timing was not right for Accurus to make an acquisition.[43] ZTM then struck a deal

---

[39] D.I. 64, Ex. 6 (Taylor Dep.) 205:7–14; D.I. 64, Ex. 7 at ACC_000032300–04.

[40] D.I. 64, Ex. 7 at ACC_000032300.

[41] *Id.*

[42] *Id.* at ACC_000032302.

[43] D.I. 67, Ex. D (Gibson Dep.) 220:11–221:24.

with another buyer, but that deal fell through.[44] Thereafter, Dunn contacted Liberty and Accurus again in early 2016.[45] Liberty and ZTM re-engaged the sale process and signed a new confidentiality agreement that was substantially similar to the previous agreement.[46]

Sometime before March 2, ZTM began producing documents for Liberty to review to evaluate the ZTM acquisition.[47] As part of Buyers' due diligence, ZTM prepared spreadsheets of projections for Buyers to review, which included information on the airplane part numbers under contract, part quantities, the contract expiration dates, pricing, gross margins, sales, projected sales, and other financial information.[48] Woodson prepared the projections under the direction of Dunn and Arthur Hoopes of Koch.[49]

In an email dated March 2, Liberty requested ZTM's revised forecasts for 2016 through 2019.[50] On March 4, on behalf of Sellers, Dunn sent several

---

[44] D.I. 14 ¶ 34.

[45] *Id.* ¶¶ 34–25; *see also* D.I. 67, Ex. D (Gibson Dep.) 227:9–20; D.I. 67, Ex. H (Taylor Dep.) 215:17–216:4.

[46] D.I. 14 ¶ 35; *see also* D.I. 64, Ex. 6 (Taylor Dep.) 226:24–227:5; D.I. 64, Ex. 8 at KSHD_0024859–0024863.

[47] D.I. 64, Ex. 9 (Dunn Dep.) 134:5–11; D.I. 64, Ex. 10 (Hoopes Dep.) 90:7–22.

[48] *See* D.I. 67, Exs. L-1, L-2, M-1, M-2.

[49] *See* D.I. 67, Ex. G (Woodson Dep.) 150:1–151:23.

[50] D.I. 67, Ex. L at ACC_000015109; *see also* D.I. 64 at 7; D.I. 64, Ex. 10 (Hoopes Dep.) 90:7–22.

documents to Taylor and Jim Gibson, Accurus's Chief Executive Officer, including revised sales projections for 2016 through 2019.[51] Gibson "heavily relied" on these projections during due diligence.[52] In a letter dated March 11, Liberty, on behalf of Accurus, offered to purchase ZTM for $80 million.[53]

On March 16, Dunn notified Liberty that ZTM discovered a formula error that affected the sales projections, which caused a swing of approximately $1.9 million in revenue.[54] Sellers corrected the error and circulated revised projections on March 16.[55] The parties did not circulate any additional revised forecasts.[56] Liberty did not revise its offer to purchase ZTM.[57]

The projection spreadsheets included tabs specific to Boeing airplane models that listed each part number that ZTM was manufacturing.[58] Within each tab, ZTM identified parts for which it would not have the opportunity to re-bid when their contracts expired.[59] If a part was no longer available for re-bid, it was marked with

---

[51] D.I. 14 ¶ 36; D.I. 67, Ex. L at ACC_000015108.

[52] D.I. 67, Ex. D (Gibson Dep.) 359:21–24.

[53] D.I. 67, Ex. N at ACC_000017857–60; D.I. 64, Ex. 10 (Hoopes Dep.) 99:21–101:23.

[54] D.I. 67, Ex. M at ACC_000015130.

[55] *Id.*; D.I. 64, Ex. 9 (Dunn Dep.) 174:12–175:23.

[56] D.I. 67, Ex. E (Hoopes Dep.) 187:5–10; D.I. 67, Ex. G (Woodson Dep.) 328:21–329:2.

[57] D.I. 64, Ex. 6 (Taylor Dep.) 298:1–18.

[58] D.I. 67, Exs. M-1, M-2.

[59] *Id.*

a red triangle to alert Buyers of the expiring contract without the opportunity to re-bid.[60] Projections for parts marked with the red triangle indicated no future sales.[61] All parts without the red triangle were presented as available for re-bid, with sales projected through 2019.[62] The forecasts also included the gross margins for each part number.[63] Sellers "believed at the time the forecast spreadsheets were created that the prospective buyer would have the opportunity to bid on [certain parts expiring at the end of 2016]."[64]

After due diligence began but before the parties executed the APA on June 3, ZTM communicated with Boeing about parts expiring at the end of 2016 and new parts, and provided Buyers with information regarding those communications.[65] For example, on March 2, Woodson emailed Boeing with a list of expiring parts, stating: "Below is the list of parts we were discussing yesterday that were on the RFQs that extended 2015 but are expiring in 2016 that we were told we lost. If there is an opportunity to re-bid these we would be very interested in fighting to keep this work

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] D.I. 77 at 11; *see also* D.I. 67, Ex. C (Julius Dep.) 66:10–23; D.I. 67, Ex. D (Gibson Dep.) 200:3–23.

[65] D.I. 68, Exs. S, T, U, V, W.

at ZTM."[66]   The parts referred to in the March 2 email were marked with a red triangle in the projections because ZTM did not secure contracts for those parts and understood they would not result in future revenue.[67]   Boeing continued to award parts to ZTM during this period.[68]  ZTM alerted Buyers of the newly awarded parts, and Buyers analyzed how these awards affected the projections.[69]

During this period, Buyers and their consultants also sought part information from ZTM[70] and specifically requested that ZTM clarify the status of parts identified in the projections.[71]  For example, on February 19, Hoopes emailed Dunn regarding a "write up of 2015 Follow on and 2016 expiring parts," and stated that "ZTM has a large number of Boeing parts that are due to expire at the end of 2016 [and] ZTM

---

[66] D.I. 68, Ex. T at ACC_000056129; D.I. 66 at 15.

[67] *See* D.I. 67, Ex. L at ACC_000015113; D.I. 67, Ex. M at ACC_000015138.  ZTM's pattern of communicating with Boeing about potentially lost opportunities to bid continued between signing and closing.  On June 22, ZTM coordinated with Buyers about contacting Boeing about new bids for parts expiring in 2016, stating "[w]e have received some quotes from [Boeing] for our existing parts that are scheduled to come off our contract at the end of 2016."  D.I. 68, Ex. CC at ZTM_0016272.

[68] *See* D.I. 68, Exs. W (Award Letter dated May 10, 2016), Ex. Z (Award Letter dated May 13, 2016), Ex. AA (Award Letter dated May 18, 2016).

[69] *See* D.I. 68, Ex. BB at ACC_000095692.

[70] *See* D.I. 68, Ex. U.

[71] *See* D.I. 68, Ex. V at ACC_000023148; D.I. 68, Ex. X at ACC_000028722.

14

has already quoted on 212 of the 608 parts."[72] The revenue for the expiring parts in that email as expiring was not included in the March projections.[73]

As Liberty's primary negotiator with responsibility for reviewing the APA, Taylor knew prior to executing the APA that certain Boeing parts were expiring at the end of 2016, and that there was no guarantee that Accurus would win a bid to continue manufacturing expiring parts.[74] ZTM informed Accurus that they believed the Company would have the opportunity to bid on the expiring parts.[75] As Julius testified: "At the time of the sale . . . everybody thought the opportunity to quote [the expiring parts] would come."[76] However, ZTM "never promised those parts to Accurus or Liberty."[77]

### C. Accurus Purchases ZTM Pursuant To The APA.

Accurus purchased ZTM's assets pursuant to an Asset Purchase Agreement executed on June 3, 2016 (the "APA").[78] The deal closed on July 29 (the "Closing"). The APA contains an integration clause that states: "The Transaction Documents constitute the entire agreement and understanding of the Parties and supersede all

---

[72] D.I. 68, Ex. S at KSHD_0024727.

[73] D.I. 68, Ex. O (Dunn Dep.) 201:6–24.

[74] D.I. 64, Ex. 6 (Taylor Dep.) 217:4–25, 223:19–224:9, 325:11–326:6, 328:7–10.

[75] *See*, *e.g.,* D.I. 67, Ex. C (Julius Dep.) 66:10–23; D.I. 67, Ex. D (Gibson Dep.) 200:3–23.

[76] D.I. 67, Ex. C (Julius Dep.) 65:13–17.

[77] *Id.*

[78] D.I. 7, Ex. A [hereinafter "APA"].

15

prior agreements, undertakings, negotiations, and communications, both written and oral, among the Parties, or any of them, with respect to the subject matter hereof."[79] The APA defines "Transaction Documents" as "this Agreement, the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Consulting Agreement, the Employment Agreements and the certificates, affidavits, and releases required to be delivered under this Agreement."[80]

The APA also contains a number of representations and warranties. Section 3.25(d) states: "Seller has disclosed to Buyer any material disputes, complaints, or issues with respect to any customers or suppliers and the manner in which Seller proposes to resolve such disputes, complaints or issues."[81] Section 3.25(a) states:

> Since the Balance Sheet Date, no customer, distributor, or supplier of the Business has terminated or materially reduced or altered its business relationship with Seller or Seller Subsidiary or materially changed the terms on which it does business with either, or threatened that it intends to cancel, terminate, or otherwise materially reduce or alter its business relationship with either.[82]

---

[79] *Id.* § 12.5.

[80] *Id.* at 78.

[81] *Id.* § 3.25(d).

[82] *Id.* § 3.25(a).

Likewise, Section 3.7(a) states:

> Since the Balance Sheet Date, the Seller Group has conducted its operations in the ordinary and usual course of business consistent with past practice, and there has not been any: (a) event, occurrence, or development that has had, or reasonably could be expected to have, individually or in the aggregate, a Material Adverse Effect.[83]

The APA defines the Balance Sheet Date as December 31, 2015. Finally, Section 3.28 states:

> No representation or warranty made by Seller in this Agreement and no statement contained in the Disclosure Schedule to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement, including the other Transaction Documents, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.[84]

The APA does not include an explicit representation or warranty as to the accuracy of the projections Sellers shared with Defendants prior to entering into the APA. The parties did not attach ZTM's sales projections to the APA. The APA does not reference the sales projections, nor does it incorporate them by reference. Nor does the APA guarantee that Buyers would be able to renew expiring parts, or even that Boeing would allow Buyers to bid on such parts.

---

[83] *Id.* § 3.7(a).

[84] *Id.* § 3.28.

The APA also establishes procedures the parties can follow in the event Buyers breached the APA's representations and warranties. Section 8.3(a)(i) of the APA states that ZTM must indemnify Accurus against any losses arising out of, relating to, or resulting from the breach of any ZTM representation or warranty, "without giving effect to any materiality, Material Adverse Effect or similar qualifications."[85] The APA includes procedures and standards the parties must follow to bring a "Direct Claim" for indemnification under the APA for breach of contract or otherwise.[86]

Under the terms of the APA, Buyers deposited funds with an escrow agent for the exclusive purpose of satisfying Accurus in the event Accurus suffered indemnifiable losses (the "Indemnity Escrow Amount").[87] Pursuant to the APA, the parties entered into a separate Escrow Agreement on July 28, 2016.[88] Bank of America, National Association Global Custody and Agency Services, as escrow agent, agreed to hold the $3 million escrow amount in an escrow fund.[89] The Escrow Agreement echoes the APA's procedures and standards.[90]

---

[85] *Id.* § 8.3(a)(i).

[86] *Id.* § 8.5(g).

[87] *Id.* §§ 1.2(b), 2.8(a); *see also* D.I. 6, Ex. B Art. I (a)–(b) [hereinafter "Escrow Agreement"].

[88] APA § 1.2; *see also* Escrow Agreement at 1.

[89] Escrow Agreement Art. I (a)–(b).

[90] *Id.* §§ 3.1–3.3.

### D.	The Buyers Discover The Lost Parts.

After the Closing, Boeing sent the Company an award letter, completing a bidding cycle that began with an RFQ Boeing issued before the acquisition.[91] Buyers compared the parts in the award letter with ZTM's projections provided during due diligence.[92]  Buyers discovered 53 parts included on ZTM's projections under contracts expiring at the end of 2016, and identified as available for rebid, were not on the award letter (the "Lost Parts").[93]  The revenue from the Lost Parts represented approximately 10% of ZTM's total projected sales from 2017 through 2019:  $3.96 million in 2017, and $4.62 million in 2018 and 2019.[94]

Boeing had awarded the Lost Parts to other suppliers before December 15, 2015, and as early as 2013 and 2014.[95]  Sellers were not aware that Boeing had awarded the Lost Parts to other suppliers prior to the acquisition; Buyers do not

---

[91] D.I. 64, Ex. 16 (Gibson Dep.) 327:8–328:16.

[92] *Id.* 311:21–312:21, 328:6–13.

[93] *Id.*  The projections identified the Lost Parts as parts that would be available for re-bid upon expiration of their contracts.  They were not marked with a red triangle. *See* D.I. 68, Ex. P ¶ 63; D.I. 67, Ex. E (Hoopes Dep.) 141:19–142:19.

[94] D.I. 67, Ex. Q at KSHD_0030750.

[95] Hearing Tr. at 50, 52, 65 ("Mr. Offenhartz: . . . Boeing's decision, we learned well into discovery, long after the pleadings were drafted, long after documents were exchanged and long after—well, in the midst of depositions, we did learn that Boeing had transferred the lost parts to someone, I think in 2013 and 2014.  Absolutely before the balance sheet closing date."); *see also* D.I. 64, Ex. 18 (Capperauld Dep.) 69:13–70:23, 163:14–206:17; D.I. 64, Ex. 19.

contend otherwise.[96]  Accordingly, Sellers did not inform Buyers that the Company would not have the opportunity to bid on those parts.[97]  Rather, Sellers had communicated to Buyers that they believed the Company would have the opportunity to bid on the Lost Parts.[98]  Had Buyers known that the Company lost that opportunity, "if [Buyers] would have chosen to continue at all, [Buyers] would have reduced [their] price."[99]

### E. Litigation Ensues.

Dissatisfied with the Company's inability to re-bid on the Lost Parts, Buyers decided to take action.  On April 5, 2017, Accurus asserted a Direct Claim against Sellers.[100]  In the Direct Claim, Accurus claimed losses from Sellers' alleged breaches of the APA that exceeded the amount of funds remaining in the Indemnity

---

[96] D.I. 67, Ex. C (Julius Dep.) 66:10–15; D.I. 64, Ex. 17 (Woodson Dep.) 287:7–19; D.I. 64, Ex. 6 (Taylor Dep.) 330:8–23.

[97] D.I. 68, Ex. P ¶ 117; D.I. 67, Ex. C (Julius Dep.) 66:10–15.

[98] *See*, *e.g.,* D.I. 67, Ex. C (Julius Dep.) 66:10–15; D.I. 67, Ex. D (Gibson Dep.) 200:3–23.

[99] D.I. 67, Ex. H (Taylor Dep.) 412:5–8.

[100] D.I. 7, Ex. C.

Escrow Fund, and demanded that the Indemnity Escrow Fund remain with the Escrow Agent pending resolution of the Direct Claim.[101]

Julius then sought relief in this Court. Julius filed his initial Complaint on September 1,[102] and an Amended Complaint on September 26.[103] In Counts I through IV of the Amended Complaint, Sellers seek a declaratory judgment that Accurus breached the Escrow Agreement and the APA, as well as specific performance of the Escrow Agreement or, in the alternative, a mandatory injunction for breach of the APA.[104] In Count V, Sellers allege Buyers breached the implied covenant of good faith and fair dealing by withholding the escrowed funds and asserting invalid indemnification claims.[105] On October 11, Buyers filed a counterclaim against Sellers, alleging they overpaid for ZTM's assets.[106] Buyers' counterclaim alleges a single count of breach of the APA, and is specifically limited to "the breach of express representations in the APA."[107]

---

[101] *Id.*

[102] D.I. 1.

[103] D.I. 6.

[104] *Id.* at 17–20.

[105] *Id.* at 21–22.

[106] D.I. 12.

[107] *Id.* at 51 n.4, 61.

The litigation proceeded. The parties filed their cross-motions for summary judgment on April 15, 2019 and completed briefing on June 18.[108] I heard oral argument on July 11,[109] and render my decision today. For the following reasons, I grant in part and deny in part both Sellers' and Buyers' motions.

## II. ANALYSIS

On their cross-motions for partial summary judgment, the parties ask me to determine the issue of liability on all counts asserted by Sellers and Buyers.[110] Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.[111]

> Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[112]

In cases involving questions of contract interpretation, like this one, courts will grant summary judgment in two scenarios: (1) when the contract is unambiguous, or (2) when the extrinsic evidence fails to create a triable issue of material fact.[113] In fact,

---

[108] D.I. 64–70, 77–79, 86–88.

[109] D.I. 96.

[110] The parties have agreed that damages and relief will be determined later.

[111] Ct. Ch. R. 56(c).

[112] Ct. Ch. R. 56(h).

[113] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012).

"[s]ummary judgment is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[114]

This matter is suited for resolution on the record presented at the summary judgment stage. The parties agree that there are no genuine disputes of material fact and that the APA and Escrow Agreement are clear and unambiguous.[115] Consequently, I resolve this issue on narrow grounds, looking only to the language of the agreements between the parties.

The parties have struggled over whether the projections are part of the APA and whether Buyers disclaimed reliance on the projections by way of the APA's integration clause.[116] Sellers have consistently argued that the projections have no bearing on the outcome of this matter. Buyers' position has been more nuanced and has evolved throughout the duration of the dispute.[117] Buyers eventually conceded that the allegedly inaccurate sales projections are not part of the APA, asserting they

---

[114] *HIFN v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007).

[115] *See* D.I. 78 at 6–77; D.I. 77 at 16.

[116] *See, e.g.*, Hearing Tr. at 11–13, 26, 28–30, 32–36, 43–44, 47–48, 51, 69–71.

[117] Initially, Buyers insinuated that they relied on the projections to their detriment when entering into the APA, and argued the projections are part of the APA because the integration clause did not sufficiently disclaim reliance on the projections. *See, e.g.*, D.I. 78 at 19; D.I. 66 at 37–39 (citing *Anvil Hldg. Corp. v. Iron Acq. Co.*, 2013 WL 2249655, at *7–9 (Del. Ch. May 17, 2013); *Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006); *Kronenberg v. Katz*, 872 A.2d 568, 575 (Del. Ch. 2004)); Hearing Tr. at 70. Buyers then implied that, even if the projections are not part of the contract, the Court should still consider them when determining whether Sellers breached the APA. *See, e.g.*, D.I. 87 at 2–3; Hearing Tr. at 32, 43.

23

are evidence of Sellers' breach.[118]  In keeping with Buyers' framing of the issue, I do not consider the projections beyond their significant role in the factual background.  I need only determine whether Sellers represented that Buyers would undoubtedly have the opportunity to bid on the Lost Parts under the APA's plain and unambiguous terms.

I conclude that Sellers did not breach the terms of the APA and therefore are entitled to partial summary judgment on Buyers' Counterclaim.  I also conclude that Buyers did not breach the Escrow Agreement or implied covenant of good faith and fair dealing and are entitled to partial summary judgment on Counts I through V of Sellers' Amended Complaint.

---

[118] Buyers reject any claim of reliance on the projections and concede that they are not part of the contract—and therefore cannot be used to interpret the APA—but believe I should turn to the projections as "evidence" of Sellers' alleged breach.  *See, e.g.*, D.I. 87 at 9–10, 10 n.5; D.I. 78 at 3, 14, 15 n.4, 19, 20, 21 n.5; Hearing Tr. at 34, 35.  According to Buyers,

> Buyers are not alleging that Sellers breached the APA because the forecasts provided by Sellers during due diligence turned out to be inaccurate.  Buyers are not alleging that Sellers breached the APA because Buyers relied on these forecasts to value the Company.  Buyers contend that Sellers breached the APA because the representations and warranties Sellers made in the APA concerning ZTM's relationship with Boeing and the financial condition of ZTM were false.  Although the forecasts are relevant to identifying, explaining, and valuing the breaches, and can be viewed as a symptom or expression of the underlying facts giving rise to the breaches, they are not the source of the breaches.

D.I. 78 at 21 (citations omitted).

### A. Sellers Are Entitled To Partial Summary Judgment On Buyers' Counterclaim.

According to Buyers, Sellers breached Sections 3.25(a), 3.25(d), 3.28, and 3.7(a) of the APA by failing to notify Buyers that (1) Boeing had awarded the Lost Parts to other suppliers in 2013 and 2014 and (2) therefore, Accurus did not have the opportunity to bid on the Lost Parts. Buyers contend that, pursuant to the APA, they "were purchasing, among other assets, [] the opportunity to bid to renew the Lost Parts"[119] and that "the opportunity to re-bid on [the Lost Parts] was addressed within the representations and warranties" in the APA.[120]

Because this case involves questions of contract interpretation, I look to the language of the APA to determine whether summary judgment is appropriate.

> The principles governing contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties. Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract.[121]

"When interpreting a contract, a court must give effect to all of the terms of the instrument and read it in a way that, if possible, reconciles all of its provisions."[122] "[A] court will prefer an interpretation that harmonizes the provisions in a contract

---

[119] D.I. 87 at 3.

[120] D.I. 78 at 11.

[121] *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citations omitted).

[122] *GRT, Inc.*, 2012 WL 2356489, at *4.

as opposed to one that creates an inconsistency or surplusage."[123] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[124]

Contracting parties allocate risk through representations and warranties.[125] Delaware courts "respect the ability of sophisticated businesses . . . to make their own judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price factors such as limits on liability."[126] Consistent with Delaware's pro-contractarian policy, "a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table."[127] Delaware law presumes parties are bound by the language of the agreement they negotiated, especially when the parties are sophisticated entities that have engaged in arms-length negotiations.[128]

---

[123] *Id.*

[124] *Eagle Indus., Inc. v. Devilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[125] *See Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007), *judgment entered*, (Del. Ch. Aug. 15, 2007), and *aff'd*, 945 A.2d 594 (Del. 2008).

[126] *Abry P'rs*, 891 A.2d at 1061.

[127] *GRT, Inc.*, 2012 WL 2356489, at *7.

[128] *See HC Cos., Inc. v. Myers Indus., Inc.*, 2017 WL 6016573, at *5 (Del. Ch. Dec. 5, 2017).

With these principles in mind, I look only to the plain language of the APA's representations or warranties to determine whether the parties accounted for the risk of unknown and undisclosed lost parts. Here, Buyers' bargained-for representations and warranties did not protect them against the risk that they would be unable to bid on the Lost Parts. Nor did the APA impose on Sellers an obligation to notify Buyers about Boeing's decision to award the Lost Parts to other suppliers in 2013 and 2014. Buyers cannot demonstrate Sellers breached the APA, and Sellers are entitled to summary judgment on Buyers' Counterclaim.[129]

### 1. Sellers Did Not Breach Section 3.25(d) of the APA Because There Were No "Disputes," "Complaints," or "Issues" With Respect To Boeing And The Lost Parts.

Buyers argue that the fact that "ZTM no longer had the opportunity to bid to renew the Lost Parts" was a "material issue" that Sellers were obligated to disclose under Section 3.25(d).[130] Section 3.25(d) states: "Seller has disclosed to Buyer any material disputes, complaints, or issues with respect to any customers or suppliers and the manner in which Seller proposes to resolve such disputes, complaints or issues."[131] The parties disagree as to whether the lost opportunity to bid is a material "issue" with Boeing. Because the APA is unambiguous, I discern the parties'

---

[129] *See GRT, Inc.*, 2012 WL 2356489, at *7 ("[A] party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table.").

[130] D.I. 78 at 3–4, 22.

[131] APA § 3.25(d).

intended meaning by giving the term "its ordinary and usual meaning" and reading the APA as a whole.[132]

Dictionary definitions assist in discerning the usual and ordinary meaning of "issue."[133] *Black's Law Dictionary* defines "issue" as "a point in dispute between two or more parties."[134] Merriam-Webster defines "issue" as: "a vital or unsettled matter;" a "concern" or "problem;" "a matter that is in dispute between two or more parties;" and "the point at which an unsettled matter is ready for a decision."[135]

---

[132] *Nw. Nat'l Ins. Co.*, 672 A.2d at 43 (citations omitted).

[133] *See Horton v. Organogenesis Inc.*, 2019 WL 3284737, at *4 (Del. Ch. July 22, 2019) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006))).

Buyers contend the term I must construe is not simply "issue," but "material issue." D.I. 87 at 14, 16–17. Buyers assert that this phrase carries its own, special meaning, and cite *Black's Law Dictionary*. *Id.* at 16–17. Buyers are correct that "material issue" is its own term of art, but incorrectly assume that its specialized definition informs the contractual interpretation issue before me. *Black's Law Dictionary* defines "material issue" as "an issue that must be decided in order to resolve a controversy" and offers an example: "the existence of a material issue of disputed fact precludes summary judgment." *Material Issue*, *Black's Law Dictionary* (11th ed. 2019). As contrast, *Black's Law Dictionary* defines "immaterial issue" as "an issue not necessary to decide the point of law" and refers readers to the definition of "material issue" for further context. *Immaterial Issue*, *Black's Law Dictionary* (11th ed. 2019). Buyers invoke a meaning of "material issue" that is a term of art in the litigation context. Buyers make no argument and offer no evidence that the parties intended import that specific term of art into the APA. Therefore, I focus on the meaning of "issue" alone, recognizing that it is modified by the term "material," which has its own importance.

[134] *Issue*, *Black's Law Dictionary* (11th ed. 2019).

[135] *Issue*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/issue (last visited Oct. 30, 2019).

From these definitions, I conclude that the parties intended to adopt the ordinary meaning of "issue," which requires there to have been an actual dispute or question raised by ZTM or Boeing that ZTM or Boeing intended to resolve. This necessarily implies that ZTM or Boeing needed to be aware of a problem—namely Boeing's decision to award the Lost Parts to other suppliers and ZTM's dissatisfaction with that decision—and bring that problem to the attention of the other party for inquiry and resolution, thereby creating an "issue" between Boeing and ZTM.[136]

Reading the APA as a whole bolsters my interpretation of "issues." The other terms in Section 3.25(d), namely "disputes" and "complaints," reinforce the conclusion that the parties intended to adopt the plain and ordinary meaning of "issues."[137] *Black's Law Dictionary* defines "dispute" as a "conflict or

---

[136] The parties sparred extensively over Section 3.25(d)'s lack of a knowledge qualifier. Buyers contend that because there is no language conditioning the duty to disclose on Sellers' knowledge of the fact that Boeing awarded the parts to other suppliers, Sellers are liable under 3.25(d) notwithstanding the fact ZTM was unaware that Buyers would not have the opportunity to bid on the Lost Parts at the time of contracting. I agree that Section 3.25(d) does not have a knowledge qualifier that would have clearly allocated the risk of loss to Buyers. However, the need for Sellers to have been aware of Boeing's decision to award the parts to other suppliers, thus eliminating the opportunity to bid on the parts, is implicit in the definition of "issue." Logically, ZTM could not have an "issue" with Boeing over the "unsettled question" of whether it would be able to bid on the Lost Parts if ZTM was unaware of Boeing's decision. Having an "issue" necessarily implies that one is aware of the underlying problem.

[137] Sellers contend I should apply the canon of interpretation of *noscitur a sociis*, which requires that words "be interpreted in the context of words surrounding them." *Agar v. Judy*, 151 A.3d 456, 473 (Del. Ch. 2017) (internal quotation marks omitted) (quoting *Zimmerman v. Crothall*, 2012 WL 707238, at *7 (Del. Ch. Mar. 27, 2012)). Buyers,

controversy."[138]    Merriam-Webster defines the noun "dispute" as "verbal controversy," "debate," or "quarrel," and defines the verb as "to call into question or cast doubt upon," "struggle against," "oppose," or "contend over."[139]  Further, Merriam-Webster defines "complaint" as an "expression of grief, pain, or dissatisfaction" or "something that is the cause or subject of protest or outcry."[140]  Similar to the definitions of "issue," the definitions of "dispute" and "complaint" require there be an active controversy of which both parties are or become aware.

Buyers eschew the plain meaning of "issues" and argue for a broader reading. Buyers contend I should not interpret "issues" in a way that harmonizes it with "disputes" and "complaints," arguing that "defining an agreed-upon contractual term as a redundancy violates the established canon of contract interpretation that a contract should not be read to render terms superfluous."[141]  "While redundancy is

---

correctly point out that "the doctrine of *noscitur a sociis* only applies where a contractual term is ambiguous." *Zimmerman*, 2012 WL 707238, at *7.  Here, the parties agree that the APA is unambiguous and that I can resolve the pending motions by interpreting the terms according to their plain and ordinary meaning.  I do so here, and I do not need to use the definitions of "disputes" or "complaints" to interpret the meaning of "issues."  Rather, reading the APA as a whole, I note those consistent definitions to confirm that the parties intended "issues" to be interpreted in accord with its plain meaning:  a problem, concern, or matter in dispute between two parties.

[138] *Dispute*, *Black's Law Dictionary* (11th ed. 2019).

[139]  *Dispute*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dispute (last visited October 30, 2019).

[140]  *Complaint*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/complaint (last visited October 30, 2019).

[141] D.I. 87 at 14–15.

30

sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy."[142]  My interpretation reflects conservative verbosity, not improper redundancy.  "Issue" itself is defined in terms of a "*dispute* between two or more parties."[143]  Both "issue" and "complaint" imply a "concern" or "problem" existing "between two or more parties"[144] that has risen to a "conflict or controversy."[145]  Although the Court prefers to avoid surplusage when interpreting a contract, I decline to dismiss the plain and ordinary meaning of "issues" to achieve that goal.

Prior to the sale of the Company, Sellers identified and actively responded to a lost opportunity to bid on 44 parts valued at approximately $2 million in sales, which is less than the $3.3 million in sales in 2015 for the Lost Parts.[146]  The 2015 lost opportunity became an "issue" between Boeing and ZTM.  ZTM actively sought the opportunity to bid on parts, and Boeing responded with RFQs indicating that ZTM lost the opportunity to bid on certain parts.  Shortly thereafter, ZTM took

---

[142] *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *15 (Del. Ch. June 6, 1996).

[143] *Issue*, *Black's Law Dictionary* (11th ed. 2019).

[144] *Issue*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/issue (last visited October 30, 2019).

[145] *Dispute*, *Black's Law Dictionary* (11th ed. 2019).

[146] D.I. 88, Ex. MM at ACC_000058015; D.I. 88, Ex. OO; D.I. 88, Ex. G-1 (Woodson Dep.) 341:2–13.

immediate steps to secure the opportunity to re-bid.  In that scenario, ZTM became aware of a loss that created a "vital or unsettled matter" with Boeing.[147]  This nuance does not compel a finding that every lost opportunity is an "issue."

The facts surrounding the Lost Parts are distinct.  No "issue" arose when Boeing awarded the Lost Parts to other suppliers and ZTM lost the opportunity to bid on those parts.  Neither Boeing nor ZTM raised any problem or made any inquiry about the Lost Parts when Boeing awarded those parts to other suppliers in 2013 and 2014.  Buyers offer no evidence that Boeing alerted ZTM that the Lost Parts were awarded to other suppliers in 2013 or 2014, or that such an alert became a "matter [] in dispute"[148] between the parties.  ZTM was not aware of a loss that became a "vital or unsettled matter"[149] in ZTM's relationship with Boeing.  In 2013 and 2014, ZTM had no occasion to respond to Boeing's decision to award the Lost Parts to other suppliers, raise for Boeing's consideration the question of whether ZTM would be able to re-bid on the Lost Parts, or actively pursue the opportunity to re-bid on the Lost Parts.  ZTM did not know that it had lost that opportunity.

The fact that Boeing awarded the Lost Parts to other suppliers is not, by itself, evidence of a dispute, complaint, or issue between ZTM and Boeing.  ZTM and

---

[147]    *Issue*,    Merriam-Webster    Online    Dictionary,    https://www.merriam-webster.com/dictionary/issue (last visited October 30, 2019).

[148] *Id.*

[149] *Id.*

Boeing had an LTA, and it was typical for parts to be added to or removed from that LTA. Buyers have not demonstrated that awarding parts to other suppliers was the result of, or resulted in, any disagreement between Boeing and ZTM.

Rather, after Boeing awarded the Lost Parts to other suppliers, ZTM and Boeing continued their business relationship without any dispute until Accurus voiced its concerns after Closing. In a June 2016 letter to Boeing, Jim Gibson, then-President of Accurus, recognized ZTM's "good standing with The Boeing Company."[150] One month before the parties signed the APA, Boeing sent ZTM three award letters awarding ZTM additional parts to manufacture.[151] After the Closing, Boeing renewed its contracts for "most of the parts set to expire in 2016 for which [Accurus] had the opportunity to bid."[152]

When the parties signed the APA, Boeing and ZTM had a good working relationship and had no disputes, issues, or complaints between each other, under the plain meaning of these terms. Thus, Sellers did not breach Section 3.25(d) by failing to disclose Boeing's decisions to move the Lost Parts to another supplier.

---

[150] D.I. 86, Ex. 2 (Gibson Dep.) 299:17–300:1; D.I. 64, Ex. 3 at ACC_000000733 (letter dated June 14, 2016).

[151] D.I. 67, Exs. W (letter dated May 10, 2016), Ex. Z (letter dated May 13, 2016); D.I. 68, Ex. AA (letter dated May 18, 2016).

[152] D.I. 66 at 14; *see also* D.I. 67, Ex. H (Taylor Dep.) 323:14–18.

## 2. Sellers Did Not Breach Sections 3.25(a) And 3.7(a) Of The APA Because Those Sections Only Apply To Events That Occurred After December 31, 2015, And Boeing Awarded The Lost Parts To Other Suppliers In 2013 and 2014.

Buyers also allege that Sellers breached Sections 3.25(a) and 3.7(a) of the APA. In particular, Buyers argue that by awarding the Lost Parts to other suppliers, Boeing materially changed or reduced its business relationship with ZTM under Section 3.25(a), and that Boeing's choice to award the Lost Parts to other suppliers and the Company's consequent inability to bid on those parts constituted a Material Adverse Effect under Section 3.7(a). Buyers have failed to demonstrate that Sellers breached the APA under the plain meaning of both Sections.

Both Sections contain dispositive temporal cutoffs. Section 3.25(a) states:

*Since* [*December 31, 2015*], no customer, distributor, or supplier of the Business has terminated or materially reduced or altered its business relationship with Seller or Seller Subsidiary or materially changed the terms on which it does business with either, or threatened that it intends to cancel, terminate, or otherwise materially reduce or alter its business relationship with either.[153]

Section 3.7(a) states:

*Since* [*December 31, 2015*], the Seller Group has conducted its operations in the ordinary and usual course of business consistent with past practice, and there has not been any: (a) event, occurrence, or development that has had, or reasonably could be expected to have, individually or in the aggregate, a Material Adverse Effect.[154]

---

[153] APA § 3.25(a).

[154] *Id.* § 3.7(a).

Sections 3.25(a) and 3.7(a) are both representations about events or occurrences occurring *after* the Balance Sheet Date of December 31, 2015. Anything that occurred before the Balance Sheet Date cannot form the basis of Buyers' claims under either Section 3.25(a) or 3.7(a). ZTM lost the opportunity to bid on the Lost Parts before that time. Boeing awarded the Lost Parts to other suppliers in 2013 and 2014. Losing the opportunity to bid on the Lost Parts did not amount to a breach of either Section 3.25(a) or 3.7(a).

Buyers contend the Balance Sheet Date has no bearing on my analysis. Buyers contend the lost opportunity to bid is tethered to the dates Boeing could have sent ZTM RFQs for the Lost Parts, December 31, 2015 through June 3, 2016, rather than the earlier date on which Boeing decided not to give ZTM the opportunity to bid.[155] With respect to Section 3.25(a), Buyers argue "the relevant period is the time of contracting in June 3, 2016, the date of signing the APA."[156] Buyers rely on Taylor's testimony that "the fundamental asset[] purchased was the right to be able to renew and compete to renew parts when they expired;"[157] on the fact that "[a]fter

---

[155] D.I. 87 at 21.

[156] *Id.* (citing *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *9 (Del. Ch. Apr. 27, 2009) ("As a default, a representation must be true at the time it is made to avoid a breach, regardless of who knew whether the representation was true or not.")).

[157] D.I. 79, Ex. H-1 (Taylor Dep.) 326:3–6.

the manufacturing right for a specific part 'expired,' it could either be renewed or awarded to another supplier;"[158] and on the reality that "the RFQ for a part could be sent close in time to the expiration date."[159]  Buyers conclude that as of the date of contracting, and after the Balance Sheet Date, Boeing had materially reduced or altered its relationship with ZTM by failing to issue RFQs for the Lost Parts.[160]

Similarly, under Section 3.7(a), Buyers argue that "the loss of the opportunity to bid to renew the Lost Parts constituted a Material Adverse Effect after the Balance Sheet Date"[161] "because after December 31, 2015, they should have received RFQs for the Lost Parts, or understood that the lack of an RFQ signaled that the parts were awarded to other manufacturers."[162]  According to Buyers, ZTM's failure to receive RFQs for the Lost Parts or follow up with Boeing to determine their status (as ZTM did in 2015 for other lost parts) rendered the lost opportunity to bid a "live issue after

---

[158] D.I. 87 at 21 (alteration in original) (quoting D.I. 77 at 2).

[159] *Id.* (citing D.I. 77 at 13).

[160] *See id.* ("Sellers failed to disclose that Boeing had materially reduced or altered its business relationship from December 31, 2015 through June 3, 2016—the time during which, by its own admission, RFQs for the Lost Parts could be sent.  In so doing, Sellers breached their representation.").  Similar to my comment in note 136, *supra*, the parties disputed what effect knowledge qualifiers had on my analysis under Sections 3.25(a) and 3.7(a).  As with Section 3.25(d), Sections 3.25(a) and 3.7(a) do not include knowledge qualifiers that would have clearly allocated the risk of an unknown loss to Buyers.  Because the clear temporal qualifier shifted the risk of this particular loss to Buyers, I need not reach the effect of the absence of a knowledge qualifier.

[161] D.I. 78 at 24.

[162] D.I. 87 at 23.

36

December 31, 2015"[163] that "could reasonably be expected" to have a Material Adverse Effect.[164]

I assume for purposes of this analysis that losing the opportunity to bid on the Lost Parts amounted to a material reduction in ZTM's relationship with Boeing, or a Material Adverse Effect.[165] Even so, I conclude ZTM did not breach Sections 3.25(a) and 3.7(a) because the triggering event occurred before the Balance Sheet Date. Boeing conclusively eliminated ZTM's opportunity to bid on the Lost Parts when it awarded the Lost Parts to other suppliers in 2013 and 2014. Boeing could not have sent ZTM an RFQ for the Lost Parts before December 31, 2015, because Boeing had already awarded those parts to other suppliers. Buyers have not demonstrated that Boeing took any adverse action related to the Lost Parts after December 31, 2015, and before either the execution of the APA on June 3, 2016 or the Closing on July 28, 2016.

Under Section 3.25(a), there was no material reduction in the Company's business since December 31, 2015 because Boeing awarded the Lost Parts to other

---

[163] *Id.*

[164] *Id.* (quoting APA § 11.1).

[165] The APA defines "Material Adverse Effect" as "any event, occurrence, fact, condition, or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise), or assets of the Seller Group or the Business; or (b) the ability of Seller or the Stockholders to consummate the Transactions on a timely basis." APA § 11.1.

distributors prior to that date. Under Section 3.7(a), there was no event, occurrence, or development since December 31, 2015 that could be considered a Material Adverse Effect because the Lost Parts were allocated to another supplier before that date.[166] Buyers cannot establish Sellers breached Sections 3.25(a) and 3.7(a) of the APA.

> **3.** **Sellers Did Not Breach Section 3.28 Of The APA Because Sellers' Representations And Warranties Did Not Contain Any Untrue Or Misleading Statement Of Material Fact With Respect To The Lost Parts.**

Buyers argue that the alleged breaches of Section 3.25(a), 3.25(d), and 3.7(a) are also breaches of Section 3.28. Section 3.28 is a catch-all provision that states:

> No representation or warranty made by Seller in this Agreement and no statement contained in the Disclosure Schedule to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement, including the other Transaction Documents, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.[167]

---

[166] Buyers rely on *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 143 (Del. Ch. 2003). In that case, the Court upheld "a breach of representations and warranties claim" that concerned a representation similarly limited to changes and events occurring after a balance sheet date. The plaintiff alleged there had been an adverse change in Encorp's financial condition and that Encorp had lost a major customer. *Id.* at 143. Importantly, both occurred *after* the balance sheet date and *before* the purchase agreement was executed. *Id.* Buyers' reliance on *H-M Wexford* is misplaced. Buyers claim Sellers breached Sections 3.25(a) and 3.7(a) by failing to notify Buyers a loss that occurred years *before* the Balance Sheet Date. Despite Buyers' allegations that the alleged material reduction or Material Adverse Effect occurred after December 31, 2015, Buyers cannot identify any actionable events or occurrences after that date.

[167] APA § 3.28.

Under the plain terms of the APA, Sellers explicitly represented and warranted that they disclosed all material issues with Boeing to Buyers; that Boeing had not materially altered or reduced its business relationship with ZTM since the Balance Sheet Date; that no Material Adverse Effect occurred after the Balance Sheet Date; and that none of the representations and warranties contain untrue statements of material fact.

Sellers made these representations and warranties truthfully at the time of contracting. As discussed at length above, the lost opportunity to bid on the Lost Parts was not an "issue" that required disclosure under Section 3.25. Likewise, that loss was not a material reduction in ZTM's business or Material Adverse Effect that occurred since the Balance Sheet Date. Because Sellers did not breach Sections 3.25(a), 3.25(d), or 3.7(a), Buyers cannot prevail under Section 3.28.

Those predicate sections failed to shift to Sellers any risk that Accurus would not have the opportunity to bid on the Lost Parts. Sections 3.25(a), 3.25(d), 3.28, and 3.7(a) do not contain any representations or warranties that required Sellers to notify Buyers that Boeing had awarded the Lost Parts to other suppliers in 2013 or 2014, or that guaranteed Buyers would have the opportunity to bid on the Lost Parts

at the time of sale. Buyers cannot now rely on the APA's catchall provision "to enforce a contractual right that it did not obtain for itself at the negotiating table."[168]

Buyers recognize that representations and warranties "serve an important risk allocation function."[169] Sellers informed Buyers that the Lost Parts were expiring in 2016. Sellers also informed Buyers of Sellers' sincere, yet unsubstantiated, belief that "the opportunity to quote [the Lost Parts] would come"[170] and that "those parts [the Lost Parts] were available to be bid on."[171] Yet, Buyers failed to protect the uncertain future of the Lost Parts in the APA. If preserving opportunities to bid on potentially lost parts was so valuable to Buyers, they could have bargained for explicit protections against lost opportunities. They failed to do so. Taylor, who led the APA negotiations for Buyers, confirmed he never requested that the APA include any protection against the possibility that the Lost Parts would not be renewed after calendar year 2016.[172] By failing to negotiate for contractual protections related to the Lost Parts, Buyers bore the full risk of loss.

---

[168] *GRT, Inc.*, 2012 WL 2356489, at *7.

[169] D.I. 66 at 3 (quoting *Cobalt Operating*, 2007 WL 2142926, at *28).

[170] D.I. 67, Ex. C (Julius Dep.) 65:13–19.

[171] *Id.* 66:20–22.

[172] D.I. 86, Ex. 1 (Taylor Dep.) 388:16–25.

**4. Buyers Are Not Entitled To Indemnification Under Section 8.3(a) Of The APA Because Sellers Did Not Breach Sections 3.25(a), 3.25(d), 3.28, And 3.7(a).**

Buyers contend they are entitled to indemnification under Section 8.3(a) of the APA. Buyers are correct that Sellers are required to indemnify Buyers for breaches representations and warranties under the plain language of Section 8.3(a).[173] Because Sellers did not breach the APA's representations and warranties, Buyers are not entitled to indemnification under Section 8.3(a).

**B. Buyers Are Entitled To Partial Summary Judgment On Counts I Through V Of Sellers' Amended Complaint.**

Buyers are entitled to partial summary judgment on Sellers' affirmative claims for relief. Under the APA and the Escrow Agreement, escrowed funds not subject to a pending or unresolved claim for indemnification were required to be disbursed to Sellers on the first business day following May 31, 2017.[174] Sellers contend that Buyers have improperly retained the escrowed funds for indemnification from Sellers' alleged breaches of the APA.[175]

Sellers contend Buyers proceeded on a meritless breach theory, and assert a trio of claims for relief. First, Sellers contend Buyers breached both the APA and Escrow Agreement by wrongfully refusing to release the escrow funds. Second,

---

[173] APA § 8.3(a).

[174] *Id.* § 2.8(a); Escrow Agreement § 3.3.

[175] D.I. 7, Ex. C.

Sellers contend Buyers breached the implied covenant of good faith and fair dealing inherent in the APA and Escrow Agreement by asserting a baseless claim. And finally, Sellers seek attorneys' fees on the basis that Buyers' allegedly frivolous claim resulted in unnecessary litigation.

As explained above, Sellers indeed prevailed over Buyers' breach theory. Accordingly, pursuant to the Escrow Agreement and the APA, Buyers must release the escrowed funds. But Buyers' refusal to do so while their breach of contract claim was pending was not itself a breach of those agreements. Sellers have also failed to identify any contractual gap to invoke the implied covenant, and have failed to demonstrate that Buyers acted in bad faith. Because Buyers' claims were made in good faith and were not frivolous, Sellers are not entitled to attorney's fees.

1. **Buyers Are Entitled To Summary Judgment On Counts I Through IV Of Sellers' Amended Complaint Because Buyers Did Not Breach The APA Or Escrow Agreement.**

In Counts I through IV, Sellers allege Buyers breached the APA and Escrow Agreement by seeking indemnification in accordance with those agreements' terms, and seek a mandatory injunction to remedy that breach or specific performance of the Escrow Agreement. Sellers do not dispute that Buyers followed the agreed-upon procedures.[176] Rather, Sellers allege Buyers breached the APA by following those

---

[176] *See* D.I. 77 at 31; D.I. 66 at 41; D.I. 64 at 24–25.

42

procedures to press an unsuccessful indemnification claim, thereby withholding a portion of the purchase price and refusing to authorize the release of the escrow funds.

Following negotiated and agreed-upon indemnification procedures is not evidence of a breach of contract.[177] The agreements permitted Buyers to withhold escrow amounts after asserting a Direct Claim. Even though Buyers' that claim was ultimately unsuccessful, Buyers did not breach the APA and Escrow Agreement by pursuing that claim in accordance with bargained-for terms. Buyers did not breach the APA or the Escrow Agreement.

---

[177] *See, e.g.*, *GRT, Inc.*, 2012 WL 2356489, at *5 ("If a contract specifically contemplates that a party may take action, addresses the specific obligations the other party is owed when that happens, and then the party takes that action in full accordance with its attendant obligations, there is no proper basis to conclude that the party has breached the contract by doing what the objective terms of the contract authorize.").

### 2. Buyers Are Entitled To Summary Judgment On Count V Of Sellers' Amended Complaint Because Buyers Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing.

Sellers contend Buyers breached the implied covenant of good faith and fair dealing because Buyers' Counterclaim is baseless, because Buyers breached the Escrow Agreement, and because Buyers do not have an indemnification claim.[178] Specifically, Sellers assert Buyers "demonstrated a lack of good faith and fair dealing by intentionally delaying the release of the Indemnity Escrow Fund and asserting improper and invalid indemnification claims against the Indemnity Escrow Fund."[179] The implied covenant does not reach Sellers' theory. Further, Sellers have failed to demonstrate that Buyers acted in bad faith by following agreed-upon procedures in the APA and Escrow Agreement.

"The implied covenant of good faith and fair dealing inheres in every contract."[180] The implied covenant "involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[181]

---

[178] *See, e.g.*, D.I. 86 at 18–19; D.I. 64 at 24–25.

[179] D.I. 6 ¶ 88.

[180] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

[181] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (internal quotation marks omitted) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005)); *see also Allen v. El Paso Pipeline GP, Co., L.L.C.*, 113 A.3d 167, 182 (Del. Ch. 2014) (referring to

We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both.[182]

A claim for breach of the implied covenant cannot be based "on conduct authorized by the terms of the agreement."[183] Determining whether the implied covenant applies turns on the language of the contract itself.[184]

Here, no "gap" exists in either the APA or Escrow Agreement that requires the cautious enterprise of inferring terms beyond those agreements' clear language. The parties designed the APA and Escrow Agreement for just this situation. Those contracts contemplated that Buyers would potentially bring a breach of contract claim against Sellers, and that Buyers would subsequently seek indemnification for bringing those claims. The APA expressly permitted Buyers to bring a Direct Claim against Sellers, and the Escrow Agreement provided bargained-for procedures for

---

the implied covenant as "the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement").

[182] *Nemec*, 991 A.2d at 1126 (footnotes omitted).

[183] *Dunlap*, 878 A.2d at 441; *Allen*, 113 A.3d at 183 (stating the covenant cannot be used to "contradict[] a clear exercise of an express contractual right" (quoting *Nemec*, 991 A.2d at 1127)).

[184] *Allen*, 113 A.3d at 183.

45

handling the escrowed funds in the event of a dispute.  At the time of contracting, Sellers must have reasonably expected Buyers might exercise their contractual rights.

Buyers did not act arbitrarily or unreasonably in exercising those rights.  Both Taylor, the founder and Managing Partner of Liberty, and Gibson, the former CEO of Accurus, testified that they believed ZTM breached their contractual representations.[185]  This testimony and other portions of the record indicate that Buyers asserted their claim against Sellers in good faith.[186]  And Sellers do not dispute that Buyers followed the contracts' agreed-upon procedures.  Sellers have failed to establish that Buyers acted with the bad faith required to demonstrate a breach of the implied covenant, where Buyers adhered to applicable contractual terms.  Sellers cannot now obtain judicial relief from the terms of those agreements, even if they now believe they have gotten a "bad deal."[187]  Buyers are entitled to summary judgment on Sellers' implied covenant claim.

---

[185] *See, e.g.*, D.I. 67, Ex. D (Gibson Dep.) 309:3–18; D.I. 67, Ex. H (Taylor Dep.) 318:9–12.

[186] *See, e.g.*, D.I. 7, Ex. C (detailing the basis for Buyers' claims).

[187] *Allen*, 113 A.3d at 184 (quotation omitted); *see also Kuroda*, 971 A.2d at 888 ("General allegations of bad faith conduct are not sufficient.  Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract.  Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully.").

### 3. Sellers Are Not Entitled To Attorney's Fees.

Sellers are not entitled to attorney's fees. "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[188] The Court recognizes an exception to this rule where a party has acted in bad faith.

> The party invoking the bad faith exception bears the stringent evidentiary burden of producing clear evidence of bad-faith conduct by the opposing party. The standard is arduous: situations in which a party acted vexatiously, wantonly, or for oppressive reasons.[189]

"There is no single standard of bad faith that justifies an award of attorneys' fees— whether a party's conduct warrants fee shifting under the bad faith exception is a fact-intensive inquiry."[190] "Delaware courts have previously awarded attorneys' fees where (for example) parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[191] "Ultimately, the bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[192]

---

[188] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[189] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012) (quotations omitted).

[190] *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 880–81 (Del. Ch. 2012).

[191] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (internal quotation marks omitted) (quoting *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

[192] *Nichols v. Chrysler Gp., LLC*, 2010 WL 5549048, at * 3 (Del. Ch. Dec. 29, 2010).

Sellers argue Buyers "unnecessarily required the institution of this litigation by improperly and without justification refusing to release the escrowed funds."[193] Sellers have failed to meet their stringent burden of producing clear evidence of Buyers' bad faith conduct. Buyers did not "knowingly assert[] frivolous claims"[194] or engage in "obstinate, deceptive or inherently unreasonable" conduct.[195] After the Closing, Buyers became aware that Sellers' representations and warranties were potentially false.[196] Buyers investigated internally and contacted both Sellers and Boeing in an effort to understand the problem with the Lost Parts.[197] Thereafter, earnestly believing the representations in the APA were false, Buyers sent a claim notice in accordance with the APA's indemnification procedures and within the Escrow Agreement's deadline.[198]

Buyers believed Sellers breached the APA and disagreed with Sellers' interpretation of the applicable sections. Sellers have offered no evidence that Buyers relied on their preferred interpretations of the APA in bad faith. Indeed, Buyers' claims required the Court to interpret the APA. While I have concluded that

---

[193] D.I. 64 at 26.

[194] *Johnston*, 720 A.2d at 546.

[195] *Marra*, 2012 WL 4847083, at *4.

[196] *See* D.I. 78 at 31–32.

[197] *See id.*

[198] *See id.*; *see also* APA Art. §§ 8.3, 8.5(g); Escrow Agreement §§ 3.2–3.3.

Sellers did not breach the APA, that fact is insufficient, without more, to warrant a finding that Buyers brought their claims with bad faith. With no special circumstances warranting shifting fees, each party bears its own.

## III. CONCLUSION

For the forgoing reasons, Sellers' partial motion for summary judgment on the issue of liability is DENIED as to Counts I through V of Sellers' Verified First Amended Complaint, and GRANTED as to Buyers' Counterclaim. Buyers' partial motion for summary judgment is GRANTED as to Counts I through V of Sellers' Verified First Amended Complaint, and DENIED as to Buyers' Counterclaim. The parties shall confer and submit an implementing order consistent with this opinion, and a scheduling order to address any remaining issues.